529 P.2d 1200

**SHERRILL & LA FOLLETTE, Appellant,**

v.

**COUNTY OF MOHAVE and the Department of Property Valuation of the State of Arizona, Appellees.**

**No. I CA–CIV 2122.**

Court of Appeals of Arizona,
Division 1,
Department A.

Jan. 7, 1975.

Rehearing Denied Feb. 18, 1975.

Review Denied March 18, 1975.

Fennemore, Craig, von Ammon & Udall by John J. O'Connor, III, Phoenix, for appellant.

N. Warner Lee, Atty. Gen. by Mary Z. Chandler, Asst. Atty. Gen., for appellees.

## OPINION

STEVENS, Judge.

Sherrill & La Follette (Sherrill), a partnership, own land in Mohave County. A portion of these lands was classified as subdivision lands for ad valorem tax purposes and Sherrill appeals contending that these lands should have been classified as grazing lands. The valuation of three parcels of property are within this appeal and for the sake of brevity will be referred to as Section 1, Section 3 and Section 33 where necessary.

Sherrill, for $372,500, purchased approximately 2,700 acres in Mohave County in 1955, part of which land concerns this appeal. William La Follette (La Follette) testified that the partnership acquired this property to develop it for agricultural production, particularly cotton. These plans were frustrated because of restrictions imposed on the transfer of cotton allotments from Pinal County. In 1958, Sherrill entered into a grazing lease with Vernon Brown for Sections 3 and 33. Brown also leased several contiguous sections of land from the Fort Mohave Indians. Brown agreed to fence all these leased lands, and to maintain these fences once they were built. Brown also quitclaimed certain property to Sherrill as part of the bargain. The lease did not provide for rent. In 1965, Sherrill and Brown amended their lease by returning Brown's land and providing that Brown was to pay $100.00 per year rent thereafter. Brown died in 1968 and in 1969 the lease was terminated. In 1970, Bill Evans and his brother, who used

to work for Brown, bought Brown's ranch equipment and cattle and arranged to rent the same properties previously rented by Brown. In addition, Evans leased Sections 1 and 31 from Sherrill for grazing purposes and agreed to fence the area and also to pay a rental of $300 annually.

In 1968, the Mohave County Assessor changed the classification of the Sherrill lands from grazing to subdivision lands. The Assessor also applied a reversion factor of nine years to the property to account for the rate of development (A.R.S. § 42–123(A)(5)) even though the usual reversion factor is from three to five years. Sherrill exhausted its administrative remedies, paid the tax under protest and appealed to the Superior Court for Mohave County. The trial court affirmed the decision of the County Assessor and held that the defendants complied with the requirements of A.R.S. § 42–123(A)(5), and that Sherrill failed to establish that defendants have applied an excessive valuation to their property. Sherrill filed a timely notice of appeal.

At the outset, we should state the standards applicable to property tax appeals. The valuation or classification of property as approved by the taxing authority is, by statute, presumed to be correct and lawful. A.R.S. § 42–147(B) (now § 42–152(B), Supp.1974). Our Supreme Court, without deciding the effect of such a provision, stated that presumptions established by statute are entitled to greater weight than presumptions established by common law. Arizona Corporation Commission v. Reliable Transportation Company, 86 Ariz. 363, 346 P.2d 1091 (1959). In a subsequent opinion, without reference to the above case, the Supreme Court quoted an earlier case and stated:

" 'The presumption, although declared by statute, is one of fact, and may be rebutted and overcome by the evidence.

. . .

" '. . . Whenever evidence contradicting the presumption is received, the presumption disappears, and the trial court is bound to follow the usual rules

of evidence in reaching the ultimate conclusion of fact. The presumption is never to be placed in the scale and weighed as evidence. When the opposite party has produced *prima facie* evidence, the presumption has spent its force and served its purpose, and the party in whose behalf it had theretofore operated must meet the opponent's *prima facie* case *with evidence and not with presumptions'*." (Citations omitted, emphasis original) Graham County v. Graham County Electric Cooperative Inc., 109 Ariz. 468, 470, 512 P.2d 11, 13 (1973).

In essence, therefore, we have the statutory presumption that the valuation or classification of the property is correct and lawful. In Arizona, the burden of proof that the classification and valuation were erroneous is upon the plaintiff. Navajo County v. Four Corners Pipe Line Company, 107 Ariz. 296, 486 P.2d 778 (1971). The plaintiff, Sherrill, presented evidence contradicting this presumption and the presumption disappeared. The taxing authorities then presented their evidence. The trial court then had to weigh the evidence and make findings of fact. In the present case, although the trial court in effect affirmed the valuation of the taxing authorities, the trial court fixed its own valuation on the property in question. "It is for this Court to determine, on appeal, whether the trial court's decision was based on competent evidence sufficient to substantiate the finding, and, if so, then the superior court was proper in fixing its own evaluation." Navajo County v. Four Corners Pipe Line Company, supra, 107 Ariz. at 299, 486 P.2d at 781. Our duty then is to examine the record and determine if the trial court based its decision on competent evidence sufficient to substantiate the finding.

Sherrill, in its own words, presented the following questions for review:

"(1) In valuing Sherrill & LaFollette's Lands, did Appellees take into account the current usage of the Lands?

"(2) In valuing Sherrill & LaFollette's Lands, did Appellees follow the Department's directive that current usage of the property to be valued would not only be *a* factor in determining full cash value, but *the* 'predominant' factor?

"(3) What is the full cash value of the Lands valued as grazing lands?" (Emphasis original)

The Supreme Court, in Southern Pacific Company v. Cochise County, 92 Ariz. 395, 377 P.2d 770 (1963), struck down the Arizona property taxing system as it then existed. Subsequently, the Legislature enacted the laws pertaining to this appeal. Section 42–123(A)(5) provides that the Director of Property Valuation shall:

"Adopt standard appraisal methods and techniques for use by the department and county assessors in determining the valuation of property, and prepare and maintain manuals and other necessary guidelines reflecting such methods and techniques in order to perpetuate a current inventory of all property subject to taxation and the valuation thereof. In the standard appraisal methods and techniques adopted *current usage shall be included in the formula for reaching a determination of full cash value* and when the methods and techniques adopted prescribe the use of market value data as an indication of market value, the price paid for future anticipated property value increments shall be excluded." (Emphasis added.)

A.R.S. § 42–201, subsec. 3 states:

" 'Current usage' means the use to which property is put at the time of valuation by the assessor or the department."

The Director of Property Valuation, in compliance with the above legislative mandate, provided the following guidelines to the taxing authorities:

"Definition of Agricultural Property

"Agricultural property is that property
* * *

"1. Used for the purpose of agronomy, horticulture or animal husbandry:

"2. In which the primary function is to produce an agricultural crop or commodity;

"3. Used with the reasonable expectation of profit solely from its agricultural use;

"4. In which the primary investment is for the purpose of farming or stock ranching."

These guidelines were provided to ensure that bona fide agricultural operations be valued as such instead of valuing them at its "highest and best use" which would place an inordinately high tax burden on them. Burns v. Herberger, 17 Ariz.App. 462, 498 P.2d 536 (1972). These guidelines, practical as they may be, are inadequate to provide an answer when the landowner does not utilize the property for agricultural purposes but rather leases the land to others who in turn use the land for agricultural purposes. To this class of landowners, additional guidelines are imposed to prevent land speculators from gaining advantageous tax evaluations. These guidelines provide:

"F. Grazing Lease—any lease of privately owned undeveloped land to a livestock rancher shall be critically analyzed to determine the valid qualification of the land for classification as grazing land.

"1. The following limitations and considerations shall be viewed as guidelines in forming an opinion.

a. Does the leased parcel add substantially to the grazing capability of the ranch or is it a mere token?

b. Is there a lease history of the parcel for grazing purposes?

c. Is the rental return in line with other grazing leases in the state?

d. Does the rental return indicate a fair return to invested capital, i. e., does the return to capital indicate the property was purchased for its agricultural function and is there a reasonable expectation of profit solely from agricultural use?"

These two tests were applied to Sherrill's property and the County Assessor of Mo-have County, The Arizona State Department of Property Valuation and the trial court all found that Sherrill's land does not qualify as grazing land.

■ The trial court found that the "parcels leased from plaintiff by the Evans did not add substantially to the grazing capacity of the ranch which the Evans brothers are operating." The testimony at the trial established that the Evans leased 110 sections of land from the Bureau of Land Management in California, four sections from the Fort Mohave Indians and four sections from Sherrill in Mohave County. The Evans maintain a herd of 110 head of cattle. The Sherrill lands have a carrying capacity of two head of cattle per section which gives a total carrying capacity of six head of cattle to Sherrill's leased lands. Robert Hess, the County Assessor and Charles Ames, the Section Chief of The Agricultural Department for the Department of Property Valuation, both men of experience in evaluating agricultural lands, testified that the small carrying capacity and the relatively small amount of land involved indicated that the leased property did not substantially add to the Evans' operation. Evans testified that he ran his cattle "[i]n Mohave Valley on these specified sections in addition to other sections." We believe that the trial court, facing this testimony, was justified in finding that the parcels in question did not add substantially to the grazing capacity of the ranch.

The trial court found that "[t]he lease of Sherrill and La Follette to Brown did not include Section 1. Section 1 was, prior to the time the property was leased to the Evans brothers not even under a grazing lease." Sections 3 and 33, however, do have a lease history both to Brown and to Evans. There was no lease on these lands from 1969 when the lease was terminated with Brown's widow until the lease was entered into with the Evans in September of 1970. The Evans' cattle, however, did graze on the property in question in return for work done by the Evans. The Evans

"assisted [Sherrill] with some semi-preliminary work on his subdivision such as surveying, brushing, surveying and grading work."

The Evans in their lease with Sherrill agreed to pay $150 rental per section annually. The Evans in their lease agreed to pay the Fort Mohave Indians $225 rental per section annually. The rental paid to Sherrill was 50% lower than the rent paid to the Indians. The Evans were required to build a fence around the leased Sherrill lands. The lease provided that the Evans were to be reimbursed on a prorata basis if Sherrill terminated the lease before the five-year life of the lease expired. Brown, in the previous leases, also agreed to fence substantially the same areas.

The trial court also found that "[t]he rent received by the partnership from the Evans brothers does not indicate a fair return on the investment made by plaintiff." Testimony at the trial established that Sherrill paid about $125–$130 per acre for the land. Approximately 2,000 acres are involved in this dispute which would involve at least a $250,000.00 investment by Sherrill. The annual net income for these properties under the lease totals $600.00 We cannot say that the trial court was wrong in concluding that this did not represent a fair return on the Sherrill investments.

The trial court also found that:

"The subdivision development in the area and the activities of the partners of Plaintiff indicate that their use and intent in this area is to develop subdivisions and that they are holding the property for investment and development purposes, and not for grazing or agricultural purposes."

This finding was based on testimony at the trial that the property in the area, where the Sherrill lands are located, is used for subdivisions. La Follette testified at the trial that the partnership sold 320 acres to Colorado River Ranchos from Section 35 for $800 per acre. The Colorado River Ranchos is a corporation that does devel-

opment projects in Mohave County in which both partners are shareholders and La Follette is the past president of the corporation. Recently the partnership also sold 120 acres of land to the corporation for development. This land is located in Section 1, the same Section 1 that Sherrill maintains is grazing land. The partnership also sold some property to the Mohave Investment Association, in which La Follette owns 24% of the stock, that developed the property as the Desert Lawn Cemetery.

This discussion does establish that the taxing authorities did take into account the current usage of the lands. Appellant's main complaint seems to be that the taxing authorities should have considered only the current use and should have eliminated all other factors in evaluating Sherrill's property.

█ Sherrill next argues in its brief that "Exhibit 12, received into evidence without objection, establishes that in fact current usage was not only to be *a* factor, but *the* 'predominant' factor." (Emphasis original). Sherrill argues that the taxing authorities did not follow this directive. Our reading of Exhibit 12, which is a memorandum to department heads in the Department of Property Valuation, does not agree with Sherrill's interpretation of the memorandum. A short quote well illustrates the true meaning of the memo.

"As general guidelines, current usage shall be the predominant factor in classifying property. This means that regardless of zoning, the predominant current use will determine the classification for our records and the abstract, and also for assessment rates employed by the County Assessor. This means that there really is no such thing as 'vacant commercial land', 'vacant industrial land', or 'vacant residential land.'"

█ The rule is well established that where the evidence is in conflict, an appellate court will not substitute its opinion for that of the trial court. Holaway v. Realty Associates, 90 Ariz. 289, 367 P.2d 643 (1961). There is competent evidence to

substantiate the findings of the trial court and we affirm the decision of the trial court. In view of the foregoing, we need not answer Sherrill's third question presented for review.

Affirmed.

OGG, P. J., and DONOFRIO, J., concur.